Argued June 26; affirmed July 24, 1934

## STATE *v.* HAINES

(34 P. (2d) 921)

*Rawles Moore,* of Medford, for appellant.

*George Codding,* District Attorney, of Medford (G. W. Neilson, Assistant District Attorney, of Medford, on the brief), for the State.

KELLY, J. The defendant, Ted Haynes, whose name appears in the indictment as Ted Haines, was indicted by the grand jury of Jackson county, for the crime of rape alleged to have been committed on the 6th day of August, 1933.

This indictment was filed in the circuit court of Jackson county on August 28, 1933, and defendant was arrested upon the same date.

The girl, upon whom the crime is alleged to have been committed, who will be herein designated as the prosecutrix, was 14 years of age. She lived with her father and younger sister, who was 10 years old, about three miles from Medford, the parents being separated and the mother living in Illinois.

The defendant, 30 years of age, married, with five children, had been a partner of the prosecutrix's father in a mine at Jacksonville, since the early part of January, 1933.

There had been considerable neighborhood talk of defendant's association with the prosecutrix, which came to the attention of her father, who talked the matter over with defendant and the latter promised to stay away from her. A change was observed by the father in the condition of his daughter in that she looked hollow-eyed and white and was losing weight, and about two weeks after his talk with defendant, he found in her purse a box containing about eight black capsules. Thereupon, the father brought the prosecutrix to the district attorney's office, where she admitted two acts of intercourse with defendant, one on July 30, 1933, and the other on August 6, 1933, both consummated at the same place, about two miles north of Eagle Point, Jackson county, close to a side road.

Defendant was arrested August 28, 1933, released on bail August 29th, surrendered to the sheriff by his bondsman September 3d, arraigned September 8th and allowed until September 9th to enter plea. On that date a plea of not guilty was entered and on the same date defendant was again released on bail. Several days later, the judge of the circuit court called all attorneys interested in pending cases and arranged a trial docket, commencing September 18, 1933, and at that time stated that criminal cases would be interposed between civil cases, when possible, and that counsel should be ready for trial when their cases were called.

On September 30, 1933, after conferring with defense and state attorneys, the circuit court set the case at bar for trial the following week, to follow the case of *State v. Wolf,* and when the instant case came on for hearing on October 4, 1933, defendant filed a lengthy motion for a continuance for at least one week which was denied.

The prosecutrix testified that on the morning of August 6, 1933, her father "was working at Jim Kershaw's ranch on Antelope"; that defendant called at her home and asked her to go riding that afternoon, she consented and he arranged for her to meet him down the road; that he picked her up and drove on the county road to a point about three miles north of Eagle Point, turned off on a side road, and that they got out of the car and had sexual intercourse. When returning home, defendant gave prosecutrix a box containing eight capsules, state exhibit "A", and told her to take them if she needed to do so for her menstrual period. That on July 30, she had gone to the same place with defendant where a similar act had occurred, and that he had taken her on other rides, one time to Grants Pass about the middle of July.

Testimony of the father shows that he had confidence in defendant, and, when advised by neighbors of the association of defendant with his daughter, advised him to stay away from her. That the finding of the pills in her purse aroused his suspicion, also the change in her physical condition, which caused him to bring the daughter to the district attorney's office where the facts were disclosed. The father admitted a hostile and bitter feeling toward defendant when he became convinced that defendant had committed the crime charged.

The testimony of witness, Jim Kershaw, corroborated the evidence of prosecutrix as to her father being away working at the Kershaw ranch on August 6, 1933, and that on that date defendant picked the girl up on the road about noon. Kershaw also testified as to the frequent association of defendant with the prosecutrix. On cross-examination, he also admitted hostility toward the defendant.

The testimony of Ernest Pheister shows that defendant was at the home of the prosecutrix on the morning of August 6th, while the father was away, of defendant's association with the girl and refers to a conversation with defendant regarding such association.

The evidence of Dr. C. I. Drummond pertained to the contents of the capsules alleged to have been given to the prosecutrix by defendant and was to the effect that they contained a greenish oily liquid which had the distinctive odor of savine usually used for producing menstruation.

For the defense Juanita Bates testified that on the night of the 5th and 6th of August, 1933, the prosecutrix remained at the Bates' home about three miles northeast of Medford; that prosecutrix stayed there until about noon of the 6th of August, and then, in accordance with a prearranged plan, she and the prosecutrix walked to a point referred to as "the corner at Ruhls" near Medford where they were picked up by the defendant in his car and were driven to Grants Pass; that there he took them to a show and that they returned to Medford arriving about 5:00 p. m.; that she got out of the car at the junction of Crater Lake highway and McAndrews road, several blocks from her home, giving as her reason that defendant did not want to be seen with the girls; and that defendant and the prosecutrix left in his car going up the Crater Lake highway, which is in the direction of Eagle Point.

As a rebuttal witness for the state, Viola Kershaw testified that she went to the home of prosecutrix and her father around half past seven on the morning of August 6th to engage the father to cut posts at the Kershaw ranch, and at that time prosecutrix, her sister and their father were at their home.

The defendant testified that he was 30 years of age, a married man with five children; that on August 6, 1933, he picked up prosecutrix and Juanita Bates inside the Medford city limits, drove with them to Grants Pass; that they drove around that city; that he bought a lunch and they drove half a mile out of town and ate same; that he took them to a show, bought them some popsicles and returned to Medford; that Juanita Bates got out of the car at Crater Lake avenue and Mc-Andrews road at a point several blocks from the Bates home; that he proceeded north on the Crater Lake highway with prosecutrix, stating as his reason that prosecutrix wanted to drive the car for awhile; that they drove north four or five miles and returned and that he let her out of the car on the Crater Lake highway to walk home. He denied giving the box containing the capsules to the prosecutrix.

Defendant testified on his direct examination regarding his association with prosecutrix and her sister and that he had been at their home and that the girls had been at his place frequently, his wife being present; and that during July, 1933, the father had a conversation with him, which he testified was as follows:

"He said something to the effect that I was hauling his girls around and insinuated lots of other things and at the same time he had a gun upon him, which I didn't say very much."

He was further asked:

"Q. Had you been with the girls? A. I have."

On cross-examination, he testified:

"A. I wasn't running around with the girl; I hadn't been anywhere with the girl."

He also testified on cross-examination that he had not been with the prosecutrix in his car prior to August 6, 1933, that date being the first time he had been out with her, but on a further cross-examination admitted that he had been out with her once prior to that time.

Defendant was found guilty on October 6, 1933, and sentenced on October 16, 1933. Motion for a new trial was filed October 25, 1933, and on December 15, 1933, before the motion for a new trial had been passed upon by the circuit court, defendant filed notice of appeal.

In this case there are five assignments of error.

■ First. Defendants says that the court erred in denying his motion, filed, October 4, 1933, for a continuance of the trial for at least one week.

The motion was filed on the morning of the day upon which the case was called for trial. No showing as to what any witness would testify to was made nor that any witness, not then present, could be produced at any given time in the future. It appears that defendant was surrendered by his surety upon the first bail bond given by him. Through efforts of his counsel he obtained a second bond, but the justice of the peace required defendant to leave his home and go away as a condition of approving the second bond. This rendered it more difficult to prepare for trial than it would have been if defendant could have been available at all times for conference with his counsel. We think, however, no abuse of discretion is shown in overruling the motion for continuance, which was mainly based upon the facts just stated.

■ Second. Error is assigned by reason of the refusal of the court to permit defendant to cross-examine the father of prosecutrix on the details of an occurrence

which transpired during the early part of August, 1933, and before defendant was indicted.

The father testified that the prosecutrix and her sister went swimming one night. He became worried because they had not returned home seasonably, so he went to defendant's home. Defendant's wife was there but defendant and his car were not there. The father then returned home and induced a. Mr. Lewis living across the road to take him around in search of his girls, using Mr. Lewis' car for that purpose. The girls were found at another neighbor's place and brought home. Defendant then appeared and the father had a further conversation with him. The bill of exceptions recites that the defendant further endeavored to show on cross-examination of the father of prosecutrix all of the details of his trip to defendant's home, to the Lewis home and to the place where the children were finally found, in order to show the bitterness, hostility, prejudice, animus and threats of the father against the defendant at that time.

We think that the learned trial judge was right when he ruled in effect that the hostility of the father towards the defendant was clearly shown and that any further showing on that phase of the case would be merely cumulative.

To illustrate, we quote from the father's testimony on cross-examination:

"Q. At the time you got Mr. Lewis to go with you to look for your daughter, when was that?

"A. Well, I couldn't give you no correct date on that.

"Q. Well, that is the time you took a gun along and was going to kill Mr. Haines wasn't it or something like that, you were going to shoot him.

"A. I never mentioned—I had a gun but never mentioned anything about shooting anybody.

"Q. Well, now, you did have a gun didn't you? A. I sure did.

"Q. And didn't you tell Mrs. Lewis or Mr. Lewis you were going to shoot Ted with that gun?"

The answer to this last question was to the effect that he, the father, said he would shoot the defendant if he found the prosecutrix in the defendant's presence that night in the car.

No reversible error is disclosed in the record as to this phase of the case.

 Third. It is argued that the trial court erred in denying defendant the right to cross-examine state's witnesses, the father of prosecutrix, and Jim Kershaw, regarding their acts on September 3, 1933, when, it is claimed, these witnesses and 15 or 20 other men went to the home of the surety upon defendant's first bail bond and induced said surety to withdraw from the bond.

The bill of exceptions recites that the purpose of this cross-examination was to enable the jury to know in detail of the intense prejudice of the said witness, Kershaw, and to show extreme prejudice on the part of the father of the prosecutrix.

On his cross-examination, the following questions were propounded to Kershaw and he answered them as follows:

"Q. You feel a little hostile do you not toward Ted Haines?

"A. Well, Mr. Moore, how could I help that when he poisoned my dogs and the state police tracked it down to his door, and he owed me money and refused to pay.

"Q. You and he had an argument over money, didn't you, Mr. Kershaw, at one time? A. Well, a little, yes.

"Q. He claimed you owed him money didn't he?

"A. I don't know. He owed me."

We quote further from the record at this point:

"The Court: The jury may consider his evidence of animus or feeling of hostility, but you will disregard what he said about poisoning the dogs and owing money and those various features, because I don't want to open up a wide range for controversy on that between each side.

"Mr. Moore: I wasn't going to ask him about that so we will consider that as stricken out.

"The Court: That will be stricken out and I will ask the jury to disregard that evidence as to what the reason for the animus was."

We think that the hostility of witness, Kershaw, toward defendant was clearly shown and that at most the testimony offered and rejected as to his participation in an alleged demonstration, hostile or inimical, to defendant in that its purpose was to induce defendant's bondsman to withdraw from his bail bond and surrender defendant to the custody of the sheriff, was merely cumulative.

As stated, we hold the same view concerning the testimony of the father of the prosecutrix. By this, we mean that an abuse of discretion in controlling the cross-examination of these witnesses has not been shown. The writer would not censure a trial judge for permitting the proposed cross-examination within reasonable limits, but deems it a discretionary matter.

Fourth. The fourth assignment imputes error in permitting the state over the objection and exception of the defense to cross-examine defendant about occa-

sions when the prosecutrix rode in his automobile, other than the only occasion about which defendant testified in his direct examination.

Upon cross-examination of defendant as to whether he had made auto trips with prosecutrix prior to August 6th, two questions only were objected to by the defense.

One of those questions is: "Isn't it a fact that on July 30, you were out with her * * * at Gold Hill in your car?" Defendant answered this question to the effect that on one occasion prior to August 6th, he had made a trip in his car with the prosecutrix and her sister out on the Butte Falls highway. Defendant was asked the date of that trip and he answered that he did not remember the date.

The second question, pertaining to this incident, to which the defense objected, was then asked: "It could have been around July 9, 1933, couldn't it?" To which defendant answered, "It might have been; I couldn't say."

Before the foregoing questions were asked, the state upon cross-examination asked the defendant if he had been with the prosecutrix the last of June. The defense objected to this question, but, upon the objection being overruled, defendant answered in the negative.

As stated, on his direct examination, the defendant testified that upon the day of the alleged crime, he had taken the prosecutrix and Miss Juanita Bates from Medford to Grants Pass in his automobile; that upon their return to Medford, Miss Bates left the automobile at a point about three blocks from her home. Then the prosecutrix drove the defendant's car four or five miles up the road on the Crater Lake highway; whereupon defendant turned the car round for the prosecu-

trix, rode back and let the prosecutrix off at the Buckshot road.

On his direct examination, defendant also testified that he and the father of prosecutrix started mining together about the 5th of January, 1933; that during the time defendant and the father had been upon their respective places defendant's children and the prosecutrix and her sister played together; and he also testified on direct examination to the effect that the families visited back and forth at each other's homes.

■ Remembering that the prosecutrix was only 14 years old and that defendant testified that on the day in question he permitted her to drive his automobile, we think that it was well within the range of proper cross-examination to ask defendant if he had ever before accorded the prosecutrix the same privilege. Such an inquiry certainly bears upon the probability or improbability of his having done so on the occasion in dispute. This involves the question whether at any other time than on August 6, 1933, prosecutrix had ridden in defendant's car.

■ On his direct examination, defendant also testified that their houses were about a quarter of a mile apart; that the father of the prosecutrix had no automobile; that, except for three weeks when defendant was incapacitated with an injured patella, he transported the father of prosecutrix almost daily to and from their mine; that during the summer defendant and his family were camped near the irrigating canal for approximately three months; and that quite frequently the prosecutrix and her sister came up there and went swimming. It was well within the purview of proper cross-examination to ask concerning the course taken by defendant and prosecutrix during the

period of time that defendant in his direct examination testified concerning such course.

We find no error in the action of the court in permitting the cross-examination upon which defendant bases his fourth assignment of error.

No exceptions were taken to the remarks made by the trial court in ruling upon the admissibility of evidence, although it is argued in defendant's brief that they were prejudicial. It is manifest that the remarks in question were intended only for the attorneys and that the experienced and able trial judge would have so instructed the jury if he had been apprised that defendant deemed them prejudicial.

Fifth. The motion for a new trial summarizes the questions, which we have discussed and urges that no legal arrangement was made for the reason that the purported copy of the indictment, furnished defendant, did not have upon it the endorsements which had been made upon the original indictment. Defendant also argued that there was prejudicial irregularity in the trial of the case by reason of improper argument on the part of the district attorney.

■ No objection was made, ruling announced, or exception saved, with respect to the alleged improper argument of the district attorney; and, for that reason, we think such irregularity, if any, under the facts of this case should not be rendered available to defendant on appeal from an order overruling his motion for a new trial.

■ The failure to deliver an exact copy of the indictment with its endorsements when defendant was arraigned was waived by defendant's failure seasonably to object thereto in the trial court; and by his entering a plea of not guilty: 16 C. J. Criminal Law, § 720, p. 393, and cases cited in note 26. *State v. Harper,* 172

La. 1067 (136 So. 54); *Price v. State,* 12 P. (2d) 249; *State v. Jackson,* 12 La. Ann. 679, 681; *Patterson v. The State,* 48 N. J. Law 381 (4 Atl. 449); *Lisle v. The State,* 6 Mo. 426; *Loper v. The State,* 3 How. (Miss.) 429, 431; *State v. Johnson,* Walkers Rep. (Miss.) 392, 395, 396. The arraignment itself may be so waived: *State v. Harvey,* 117 Or. 466 (242 P. 440); *Garland v. Washington,* 232 U. S. 642 (34 S. Ct. 456, 56 U. S. (L. Ed.) 772). See authorities cited in note at page 832 Ann. Cas. 1917D.

The judgment of the circuit court is affirmed.

RAND, C. J., and ROSSMAN and BELT, JJ., concur.